Kappos is a dentist in the United States, and he has been a member of the Kappos family for over 20 years.  The next case is number 2012-1097, SIRONA DENTAL SYSTEMS v. Kappos and 3M ESPE. Mr. Carpenter. Good morning, your honors. May it please the court. At the time of 3M's invention, it was simply a matter of common sense to use the coloring process described in JP-966 to make a translucent colored dental ceramic work piece or other article. The common sense basis is arrived at from the nature of the materials, alumina, zirconia, acknowledged in the patent in suit and also acknowledged in the art as a whole to be the materials of choice for medical and dental applications. In addition, it was known to use metal ion colorants to color both dental articles, such as dental prostheses, and non-dental articles. And finally, there was an interrelatedness between the references US-585 and US-548 that would have made it simply a matter of common sense for the skilled dental ceramicist to use the process in JP-966 to make one of these articles. JP-966 teaches everything in Claim 1 with the possible exception of an intended dental use. Now, in SIRONA's opening brief, we say the board erred in the way it construed the word work piece. And the government and 3M correctly point out that that was not raised below. But what was raised below, specifically we acknowledge, SIRONA acknowledges that the reference does not teach an explicitly dental use. But it clearly teaches pre-sintering, it teaches coloring with these metal ions, and it teaches sintering to yield a final translucent colored article. The specific statements that were made to the board in Respondent's brief include things like, JP-966 does not teach a dental work piece to emphasize the absence of a dental application, but not to say no article that could be worked on wasn't present. And even in the request for re-examination, we said in italics, it doesn't teach a dental italics, ceramic work piece italics, again to emphasize that we acknowledge the reference does not have a specific dental application. But that's not the same thing as saying it doesn't teach a work piece that can be worked on. Well, I understand your argument. It seems to me, though, the government spends at least a fair portion of their brief making an argument, which I don't think you really responded adequately to in gray. So I want to give you a chance to do that. Part of their argument is that the 966 had this metal salt solution, and stressing the differences between the other references, the 585 and the 548 or whatever they are, that those were dealing with metal oxide salt or with the powder, and how, one, the solutions are different, and two, really the process at issue there were different, all of which goes to the ultimate question of whether or not there was sufficient interrelatedness, I think. That's fair, Your Honor. What's your response to that? Sirona's response to that is that the references are interrelated, and despite the differences, the skilled person would have used the teachings of those references to motivate or spur the use of JP966 to make a dental ceramic work piece or other article. Look at the differences they point to. They talk about the use of a metal oxide salt. Well, that's prepared starting with a solution of a metal oxide, and then the critical addition is the metal ion colorants, and if you read the passage at that point, at A134, it talks about salt such as cobalt chloride. I'm sorry? What reference? Oh, US 585, Your Honor. US 585 says, we can make protective coatings on the outside of a ceramic article that will be chemically and mechanically stable. What column and line number do you want us to look at? Column 4, lines 9 through 30. This passage talks about how it's preferred to, if you want a colored body, then you can pick the right metal oxide, and in addition, you can introduce a metal salt, and they give the specific example of cobalt chloride. But the passages say that's added to the sole, and then the passages say this is a mixed-phase system. To me, that implies that the metal salts are in solution, meaning they're in the aqueous medium. So when we're at this level of discussion, isn't there deference that we have to apply to the board's findings? Absolutely, but the findings, Your Honor, are not – they don't preclude this conclusion at all. In fact, the findings are really skimpy, or in some cases, compound, so I may not be able to quibble with a particular finding because of the way it's presented in a compound way. So if we look at specifically what the board found, the board says about U.S. 585 that it does not apply – it does not disclose applying metal salt solutions to a pre-sintered dental ceramic workpiece. You want to look at the tape site on the board's opinion that you're referring to? A-12, this is finding 15 – or 13. It says the reference does not disclose applying metal salt solutions to a pre-sintered dental ceramic workpiece. Well, that's true because it says it doesn't disclose A plus B, but it does disclose applying metal salt solutions, A, and admittedly it doesn't apply that to B, the pre-sintered dental ceramic. The same is true in finding 16 on page 13 of the appendix with reference to U.S. 548. The finding is U.S. 548 does not disclose applying a metal salt coloring solution to pre-sintered dental ceramic workpiece and then sintering. Well, it's true that U.S. 548 does not explicitly disclose metal ion colorants. It does disclose the addition of colorants, but the reference clearly teaches the preparation of a pre-sintered dental ceramic workpiece. And you can tell this by looking at the examples and the temperatures that are used. U.S. 548 discloses a method of making a variety of dental articles, and it starts with ceramic powder, and if you want you can add iron oxide to impart a natural tooth color to it. It molds that with a binder. Then it dries it. Then it fires it, but what does it fire it at, 770 degrees, 1,000 degrees? Those are pre-sintering temperatures. They're not the elevated 1,300, 1,500 temperature ranges. And we also know that it's pre-sintering because it says these articles are porous. Well, they're not going to be porous if they're fully densified by final firing. So I can't say that this is a completely false statement because, again, finding of fact 16 is compound. It says A plus B, but I can say these findings don't go far enough to support the conclusion. With respect to, well, let me address one thing first. I want to correct a citation error, and that has relevance with respect to what you consider in terms of the claims. 3M never argued the claims with specificity below to the board, and they didn't group their claims. They didn't provide headings. Now, in my brief, I have the wrong citation to the 37 CFR. The correct citation is 41.67C17. That regulation and related case law, such as Henry Levin, basically says they've waived their chance to argue the claims individually. So we're really talking about Claim 1. Claim 1 simply says a dental ceramic workpiece. Well, our position is it's a matter of common sense to get there. Everything is taught, the exact same materials, the steps of pre-sintering, coloring with a metal ion, and sintering, and then any intended purpose of a dental-specific application would have been obvious to the skilled person. And if you have... All right. We'll hear from the other side. Okay. Thank you. Thank you, Mr. Cuthbert. Ms. Stewart? Yes. Thank you, Your Honors, and may it please the Court. Before I address the specific arguments raised by Thoreau and I, I'd just first like to take a moment to clarify what the practical effect would be with this Court's affirmance of the Board's decision. So although, as Thoreau correctly states, we are often arguing Claim 1, for example, assuming this Court affirms the Board's decision, that would result in confirmation of the patentability of Claims 4, 21, 25, and 30 through 38. And these claims are dependent claims which would have to be rewritten in independent form, assuming that this Court affirms the Board's decision. And I'd also point out, so there were two other grounds of rejection that we're not cross-appealing today. So there was a rejection under 102, and then a new ground of rejection entered under 103A. So we're not cross-appealing those, not because we agree, but just as a practical matter, we'd like to turn the page on this matter. The appellants have been now contesting this patent for over six years, first representing VITA and now representing Sirona, VITA's business partner. In any event, so we're not going to cross-appeal, and if this Court affirms, then it would result in the patentability of Claims 4, 21, 25, and 30 through 38. So first off, you know, I think as Judge Moore and others were correctly pointing out earlier today, this Court requires a substantial, a deference rather, to the substantial evidence found by the Board. And although in their briefing, Sirona's raising a lot of new and quite frankly confusing arguments about how these claim terms should be construed, it really weighs against the overwhelming evidence in the record to which this Court owes a substantial deference. And in addition, it's contrary to... Doesn't JP-966 disclose the exact method that is claimed in Claim 1 but for the dental workpiece part? It is, yes, Your Honor. It is a very similar method. However, it is not applied to dental materials and dental articles. Why? Is there some reason to think it couldn't be? Well, as the Board found, like I don't see any fact findings, for example, which would have been very helpful if they were. Well, not, for example, if the Board said, well, look, there's reasons to think that just because you can put it on a vase doesn't mean you can put it on teeth in somebody's mouth. That would make sense to me, right? Some solutions might be poisonous or something. If there was something along those lines, some reason to think it couldn't be applied to teeth, because the idea that there's a reference that says this can be applied to all kinds of porcelain, workpieces, whatever, but somehow can't go on the same substance when put in the mouth, the only conclusion I can come to, the only reason it seems to me, would be toxicity. Am I wrong? But that's not mentioned by anybody anywhere. So why? I mean, if I can paint a piece of drywall in my house that is a wall, why can't I similarly paint a piece of drywall that's just a cutout piece of drywall? What's the difference? The teeth? I mean, what's the difference? Well, Your Honor, I think that there has to be some rational underpinning that would cause someone of skill in the arts to apply the methods to a dental application. And throughout the re-examination, throughout the inter-party re-examination, all the parties agreed that the JT 966 reference did not recite the preparation of dental ceramic workpieces or dental artwork. But that's just the object to apply it to. Why? Is there some reason to think you can't put this metal fault solution onto teeth? Is there some toxicity? Was there evidence presented at the Board that arguably this one of skill in the art might not have wanted to put this on dental stuff because it's going in the mouth? No, Your Honor. There is not a toxicity issue, nor was there a toxicity issue raised. So, the Board correctly concluded that neither Serona nor the examiner established a prima facie case of evidence. And the Board's factual findings regarding the prior art cited are supported by the substantial weight of the evidence. So, we were talking about the JT 966 reference, which relates to porcelain and decorative art products. And importantly, that reference does not describe any dental products. If you look at the appendix, it's 17. I think, following up on Judge Moore's point, I think we all understand that. Okay. The question arises, though, is this isn't anticipation based on JP 966. It's in combination. Correct. And it's certainly the 585 and the 548. I mean, the 585 may use metal oxide sole rather than a solution. Correct. But clearly, it teaches a method of coloring that it calls out as being applicable to both dental ceramics and decorative ceramics. So, why is that in combination with whatever? I'm getting lost. Yes. Why aren't the combination of those sufficient? That's the teaching of the applicability of methods of coloring. Correct, Your Honor. However, there is no reason that a person skilled in the art, for example, would remove the metal oxide sole from the teachings in the 585. So, there is no rational underpinning, no motivation that would cause a person skilled in the art to somehow now exclude this metal oxide sole. No, but the question is, you start with the initial reference, and that has the exact process that we're talking about here in the claim, except that deals with decorative ceramics and not dental ceramics. Correct, Your Honor. And then you use the other prior art to say, well, we've got this prior art that's teaching the alternative use of a coloring solution, saying that you can use the same one for dental ceramics as well as for decorative ceramics. So, that teaches you. That's the motivation to say, well, hey, if you can use this solution for both, why can't you be using this solution for both decorative and dental ceramics? Yes, Your Honor, but the substrates that the US 585 reference teaches are not pre-sintered ceramics. They're glazed ceramics, essentially. And the solutions that the 585 reference uses is a mixture of a metal oxide sole, and there is nothing that would cause a person skilled in the art to suddenly remove the metal oxide sole and now apply the method of the JP 966 reference to a dental article. As a practical matter, Your Honor, as the request for the inter-party re-exam was brought by Serona, they stated, and I'm quoting from the appendix in 48, Serona stated that the JP 966 reference teaches the claim subject matter in all respects, except that it does not recite a preparation of the dental ceramic work piece. Both Serona and the examiner, everybody moved through the inter-party re-exam with that understanding, and there were many, many references in the record where everyone acknowledged and understood that there was no teaching to a dental ceramic work piece. And the board found in their findings of fact that the US 548 reference and the 585 reference relate to very different processes. The 548 reference, I'd like to point out, the doping reference, this is exactly describing the prior art that was used before the invention. So it involves mixing a metal oxide powder to the ceramic powder before you make the pre-sintered article. And with the 548 technology, dental labs would essentially have to stock 50 or 60 different colors in order to prepare dental articles to meet a variety of patient needs. And so the 548 reference is exactly what used to be done, not using a metal ion complex or solution, but actually using a powder, a metal oxide powder, and mixing that with the ceramic powder to make the starting material. And the US 585, to the extent that it uses a metal oxide sol, the substrates are not pre-sintered ceramic materials, so there is no underpinning in this combination of references to cause a person skilled in the art to then apply the JP 966 process to dental articles. And I'd also point out that the JP 966 describes colors like blue, ivory, red, yellow, and green, and these colors are obviously not applicable to dental articles. Okay, thank you. Let's hear from the office. Ms. Pettigrew? Good morning. The PTO agrees with 3M's position as ably presented by Ms. Stewart. I just wanted to address a couple of points. First, Judge Moore's question about why there's not more of a finding by the board about why JP 966 can't be used for dental articles. As Ms. Stewart pointed out, that was never a question that was raised. All of the parties agreed that JP 966 did not teach the application of that method to dental articles, and Serona and the examiner both looked to these two secondary references to find some sort of teaching that would meet a person of ordinary skill in the art to apply the JP 966 method to dental articles. The board concludes that the three references are not, quote, sufficiently interrelated. Correct. Now, in its reconsideration, it says, no, you're wrong, appellant. We didn't mean that they're not analogous art. What does it mean that the three are not sufficiently interrelated, and how do we evaluate that? What's the standard of review? Is that a question of law or a question of fact? I think it's a question of fact because it has to do with what the references actually teach. I think what the board was really saying is going back to the examiner's rejection was JP 966 teaches everything except applying that method to a dental article. As the board clarified, they were not saying that JP 966 is not analogous art, but Serona and the examiner had looked to these other two references and relied on their alleged similarity, the JP 966 method, to say that a person of ordinary skill in the art would have been led to apply the JP 966 method to a dental article. As it turns out, the board correctly found that the examiner's findings with regard to those references were incorrect, that those processes in US 585 and 548 are really much more different from the JP 966 method than the examiner had found. And I think that's where the interrelated teachings comes in. I think it goes to motivation to combine. Look, these references are so different, one wouldn't have been motivated to combine them. Is that how we should interpret it? Because it's a strange basis for... I agree. It's a strange obviousness rejection. Well, it comes out of KSR. The language does come out of KSR. And in KSR, the suggestion does sound, as Judge Moore pointed out, like they're talking about the motivation piece of it. Right. I think the question here is whether a person skilled in the art would have been motivated to apply the JP 966 method to dental articles. It's not a typical obviousness rejection, which you're looking to these other references to take pieces from here and there. It's not as if the first reference teaches everything except some widget, and then you have to go to the other reference to get that widget. The examiner and Sorona relied on these other references as a way to show that a person of ordinary skill would have extended the JP 966 method. So why aren't they interrelated enough? I mean, if we're evaluating sufficiently interrelated, why aren't they interrelated enough? I mean, they're all dealing with methods of coloring ceramics. One deals with metal oxide solution, and the other deals with metal. So, I mean, there's a similarity between what's going on here, right? In coloring ceramics, and these call out, at least the 585 calls out, that you can use the same coloring process for dental purposes. I think at a very general level, they do teach coloring dental ceramics, but the board found that essentially just because the US 585 teaches that there's a method that can be used to color both dental and non-dental ceramics, that doesn't mean that every method that can be used to color, say, decorative ceramics, could also be used to color dental ceramics. Well, yeah, but is that really the analysis we put out? I mean, if it's a motivation to combine, there doesn't have to be certitude that it would likely succeed, but a motivation to at least try? I think, again, it's not really a motivation to combine the references. It's more of a motivation to apply the JP966 method to dental articles. I thought the board was drawing the distinction between applying the coloring matter to the surface and using the pre-centered ceramic material in which it was absorbed and then, again, fused. At least that seems to be a difference between the references and what this applicant used. Yes, I see my time is up. May I answer the question? Yes, that was really the basic finding as to why the US 585 is so different from JP966, much more different from what the examiner thought. Okay, any more questions for Ms. Pettigrew? Thank you, Ms. Pettigrew. Mr. Carpenter, you have some time. Thank you, Your Honor. I'd like to address the issue of the interrelatedness and whether it's a question of fact or law, and I can simply say that I don't see that in the case law. The interrelatedness prong is found in KSR. Graham, of course, gives us the test for the obviousness determination, but it's admittedly somewhat metaphysical because it just tells you to look at the claims, look at the prior art, look at the differences, and consider the skill. One thing that hasn't been addressed here today is the level of skill in the art, and I submit that the references themselves tell you that it's pretty high. Was there a dispute below in terms of what the level of skill in the art is? No, Your Honor. It did not come up at all. But I think that's common. I think in prosecution, whether it's reexamination or regular prosecution, it's kind of taken for granted that the references are either relevant or not relevant or either analogous or not analogous, and unless somebody submits a declaration, there isn't usually evidence on that point. But you call out in your brief, right, you tell us that the level of skill in the art is a skilled dental ceramist. Well, the art pertains to making dental ceramics. You can tell from the background of the reference and the introductory parts that it's geared towards making a dental object. I mean, it would seem to be a dental ceramicist, and Sirona's position is that that person has a high level of skill as evidenced by the numerous prior art references and the degree of technology that's involved. What's interesting, though, is that in the supplemental joint appendix that I received leave to file and did file, in the preliminary amendment filed by 3M, they submit an exhibit, and that exhibit comes from a general ceramics handbook, and it describes various processing steps, sintering, pre-sintering, et cetera. But it also discloses different categories of ceramics, whiteware, porcelain, and other types of ceramics, and if you look at that… They don't mention teeth? They don't explicitly mention teeth in there, other than the phrase… They don't come close, as far as I could tell? I'm sorry? They either explicitly or any other way, they're not dealing with teeth. I think that dental ceramic technology would fall within technical ceramics, is my understanding of that, and that's a broad term in the reference. Where does it say that? It doesn't say that in the additional filing. Does it say that elsewhere? Say what, Your Honor? Are you saying that this is in the additional filing that 3M provided? In the attachment to the preliminary amendment, that handbook… That doesn't mention teeth, that was my question. Yes, it does not mention teeth, but it does mention technical ceramics, and it includes, as examples, things that… It could be artwork, but it could also be more industrial or utilitarian objects, as opposed to plates or something. My point is simply that 3M felt it was necessary to submit this general reference, and it shows you that the general technology of ceramics was known, and really, that's what's being drawn on. My point is simply that dental ceramicists look at the same ceramic technology as do artists. I mean, this is not in the record, but the first crowns, porcelain crowns, had to come from somewhere. Well, they were made by porcelain manufacturers. Another point I would like to address is… Well, let me go back. The interrelatedness point comes from KSR. It's a mixed question of fact and law, but I think this really speaks to the ultimate conclusion, and that ultimate conclusion of obviousness can be grounded on several different things. One can be common sense. One can be interrelatedness. Another can be the simple creativity and skill of the skilled person himself. A couple of other points with respect to the references. The 548 reference, 3M's counsel says, well, that's a doping process. Well, yes, iron oxide is added to the ceramic powder, and you can call that doping, but the relevance of the reference lies elsewhere. The relevance is that reference teaches making a pre-centered ceramic and impregnating a porous ceramic object with a resin, which can include a colorant. From that sense, I think it makes the reference highly relevant to the claimant issue. One other point I'd like to raise, and that is your Honor asked the question about doesn't JP-966 disclose all of the method steps, and I think 3M and the government can see that except for the dental-specific purpose. The board doesn't really speak to that in a finding. Instead, the board says on A-28 that Serona did not persuasively demonstrate that a person of ordinary skill in the art would have predicted that the metal salt solutions of JP-966 would impart the same chemical or physical effects on dental products of the type you're claiming. What physical and chemical effects could they be talking about? The materials are exactly the same as defined in the patent. The reference and the patent materials are identical. The coloring processes are identical. So, it's a bit of a strange statement from the board because there are no physical or chemical differences, certainly not in the reference. There's nothing in the 694 patent that tells you some other property is required to make these things suitable for dental applications. Okay. Thank you, Your Honors. Thank you, Mr. Carpenter. Thank you, Ms. Stewart and Ms. Peddington. Cases taken in this division. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m. Thank you. Thank you. Okay.